ENGELBERT SCHEY, Appellant, v. CENTRAL COAL & COKE COMPANY. —21 S. W. (2d) 772.

Court en Banc, October 8, 1929.

1060

*Leahy, Saunders & Walther* and *J. L. London* for appellant.

*Walter C. Goodson* for respondent.

WHITE, C. J.—The plaintiff, employed by defendant in its coal mine at Bevier, Missouri, was injured by a premature explosion while charging a drill hole with blasting powder.

The injury occurred August 23, 1917. He sued for damages January 15, 1924.

On a trial in the Circuit Court of the City of St. Louis, at the close of the plaintiff's evidence, the court gave an instruction in the nature of a demurrer to the evidence; whereupon the plaintiff took an involuntary nonsuit with leave, and appealed from the judgment of dismissal following.

The plaintiff at the time of the injury was between seventeen and eighteen years of age, and had been working in and about coal mines for about four years. For three or four months he had been drilling holes and charging them with blasting powder.

With an ordinary steel auger he would drill a hole in the face of the ore to a depth between seven and ten feet. It could be drilled in the course of a half hour if no hard substance or obstruction delayed the operation.

The manner of charging the hole with blasting powder is described by several witnesses. First, he took a scraper, or spoon, and scraped the drill hole out clean. It was about two inches in diameter. He prepared his cartridge by taking paper used for the purpose and wrapping it around a stick so as to form a hollow cylinder somewhat less than the size of the hole. He would seal up one end of the cartridge with soap and pour in the powder. He would then insert the fuse, pour in more powder and seal the other end, leaving the fuse sticking out. The fuse was about the size of a lead pencil. The cartridge was pushed into the hole. After the explosive cartridge, dummy cartridges, made in the same way as the explosive cartridge except that they were filled with clay and dirt, were tamped in, leaving a part of the fuse protruding from the hole.

In this operation the plaintiff used a steel tamper which he obtained at the company's commissary store. His evidence shows that he was directed by someone in authority to go to the commissary and get his tools. Each miner was obliged to furnish his own tools, but he usually bought them at the company's store. The plaintiff testi-

fied that he knew of no other place where he could get his tools, particularly the tamper, and accordingly he got it there. While he was pushing the cartridge into the hole with the steel tamper, an explosion occurred, causing him serious injuries, destroying the sight of his right eye.

The negligence alleged in plaintiff's petition is:

(1) That defendant carelessly and negligently failed to furnish plaintiff reasonably safe tools with which to work; that an iron or steel tamper was a dangerous instrument.

(2) That defendants carelessly and negligently failed to instruct plaintiff in the proper use of tamping tools, and especially failed to instruct plaintiff that an iron tamper was highly dangerous and was likely to explode powder when such tamper came in contact with sulphur in the coal vein.

The petition further particuarizes the negligent acts of the defendant, but such allegations come within the two general specifications stated.

The answer of the defendant alleges that it was the immemorial custom and practice in coal mining districts for miners to furnish their own tools, and that the selection of tools was left to the discretion of the miner. The answer further pleads the assumption of risk.

The reply was a general denial.

I. The plaintiff alleged that he was *eighteen* years of age, and in his brief claims that his employer was charged with notice that he was inexperienced and entitled to peculiar and special instructions on account of his immaturity. He testified that he had worked with his step-father for three years before his injury, beginning when he was thirteen years of age. He helped in setting up timbers, drilling holes, making dummies. For three or four months prior to his injury he was himself drilling holes, charging them, and using a tamper. He had worked in Illinois, and testified that he got his "miner's papers" in Illinois to handle powder, from which we infer that he had acquired sufficient experience to be trusted with that dangerous instrumentality. He said nobody told him how the hole should be drilled, nor how one should tamp the holes, nor how much powder should be used. Such things were left to the men.

His principal witness, one Sam Cook, testified that it depended upon the individual as to how long it took to learn the business; that some learned quicker than others; that one man might learn it in three or four months, and some might never learn it. Some worked for three or four years and didn't know anything; that the handling

of powder in the mine is dangerous. Every man that goes in there knows that. He goes in there with the understanding that he is to be the judge about how he handles it.

Section 7527, Revised Statutes 1919, provides that any persons desiring to perform the work of a coal miner, and to conduct a room or entry in a coal mine, before being permitted to engage in such work shall produce evidence of a satisfactory nature that he has for one year worked in coal mines *with* or *as* a practical miner, such applicant to furnish evidence of his experience and qualifications to the coal mine inspector, etc. The section provides further that until such applicant shall have satisfied the inspector he shall not be permitted to mine coal, and that any owner or operator of coal mines permitting violation of any provision of the section shall be guilty of a misdemeanor.

It is not alleged in the petition, nor is there any evidence to indicate, that the plaintiff failed to meet the requirements of that section, or that the defendant was remiss in his duty in employing him without satisfactory examination as to his qualifications. Before his employer could lawfully employ him in the business in which he was engaged he had to qualify as a practical miner. His evidence indicates that he had the requisite qualifications. In the absence of any allegation or showing that the law had been violated in that respect we must assume that he passed the inspection tests as a practical miner. No fact is alleged or proven to indicate that at his age he was less qualified than an older man would have been. The defendant therefore owed no duty to him on account of his age that it would not have owed to any other miner qualified to mine under the statute.

II. It is the duty of the master to use ordinary care to furnish his servant safe appliances with which to do his work, and the servant does not assume the risk from the use of unsafe implements unless the danger is so glaring and obvious that a reasonably prudent man would not attempt to use them. It is not necessary that the employer furnish his employees the latest known appliances and the latest pattern of tools. He performs his duty when he furnishes reasonably safe appliances. [Brands v. St. Louis Car Co., 213 Mo. 698, l. c. 707 et seq.; Compton v. Construction Co., 315 Mo. 1068, l. c. 1083; 39 C. J. 308 et seq.] In the Compton case at the page cited it was said, quoting from an earlier case: ''The legal test of reasonable safety in machinery or methods is the customary use by those engaged in like employment and work.''

Evidence is admissible, therefore, to show whether or not the appliances, etc., are such as are in ordinary and common use by others in the same business. [Id; 39 C. J. 331; Coin v. Lounge Co., 222 Mo. l. c. 505-6; Knott v. Mo. Boiler & Sheet Iron Wks., 299 Mo. 613, l. c. 630-631.]

The evidence showed that at the time of the trial it was known that an iron tamper, if it hit sulphur or any other hard substance, was likely to produce a spark. This appears from the evidence of practically every witness testifying for the plaintiff, including experts. It further appeared without objection that in Illinois and Pennsylvania laws had been enacted forbidding the use of iron or steel tampers in coal mines, that copper tipped tampers were in general use in those states and in other places; that a copper.tipped tamper was safe and would not cause a spark.

Sam Cook, for plaintiff, testified that he had dug coal in Illinois and Missouri, and that the amount of sulphur in Missouri was about the same as in Illinois. There was other testimony by experts to the effect that sulphur, which is a hard substance, is found generally in coal mines.

The cartridge which the plaintiff used in charging the hole was said to be spark proof. The powder was encased in paper which was also water proof. The end first inserted in the hole was sealed with soap so the powder could not escape. The other end from which the fuse protruded was also sealed in the same way, but the plaintiff testified that the powder might spill out at that end. It might, we infer, become loosened while being pushed back. There was also testimony to the effect that in pushing back the cartridge the paper might tear and cause the powder to spill. It might strike a jet or there might be sulphur slivers in the hole. A jet was a jag where the sulphur had been drilled around.

The defendant claims that loose powder in the hole might have been exploded by the acetylene lamp which the plaintiff carried in his hat. It is unnecessary to go over the evidence as to that. The possibility of the powder being ignited in that way was so remote that it does not amount to an alternative probability as to the way the explosion occurred.

The evidence sufficiently shows that a steel or iron tamper, when it comes in contact with a hard substance, is likely to produce a spark, and that such a spark if coming in contact with a blasting powder would produce an explosion like that which occurred. The explosion in this case could not have occurred in any other way unless in the remote possibility, practically excluded by the evidence, that it was caused by the acetylene lamp. There could have been no explosion unless the powder had escaped from the cartridge. A spark

could have come in contact with the powder if the powder escaped from the front end where the fuse extended. Or there might have been a tear in the cartridge where it was pushed back and the same obstruction which caused the tear and the spilling of the powder might have caused the spark when the tamper came in contact with it. But all these suggestions are merely guesses. One thing seems to be sufficiently proved; that a spark caused by the tamper somehow came in contact with the powder. This is not a matter of building presumption upon presumption, but it is a matter which the jury could infer from the evidence, from the actual facts testified to.

III. The answer alleges that whatever injuries plaintiff received were caused by his own negligence in selecting a tool and his negligence in allowing the cartridge to become broken, thus leaving free powder in the hole and in bringing an iron instrument close enough thereto to produce a spark. While the powder might have been spilled through the negligent construction of the cartridge by the plaintiff it might also have been caused by an unavoidable leak or tear in the cartridge without any negligence on the part of the plaintiff. The evidence is that a cartridge of that kind should be pushed back "easy" so as to avoid any rupture in the covering. The evidence indicates that the plaintiff in this case pushed this cartridge back in the usual way, with ordinary care. There is no evidence to the contrary, and no evidence that the cartridge was negligently constructed. If there was such evidence it would be a question for the jury to decide whether such spilling of the powder was due to the plaintiff's negligence.

IV. The plaintiff offered witnesses who swore that in their opinions iron tampers were not safe to use in mines and that copper-tipped tampers were in general use. This evidence was excluded by the court. The defendant was engaged in a hazardous business and employed the plaintiff to perform hazardous work. Its duty to use care in furnishing safe appliances was commensurate with the danger and hazard of that work. Its duty would include a complete investigation and the employment of experts if necessary in order to ascertain what appliances were reasonably safe for the use of its employees. Notwithstanding the excluded evidence the evidence for the plaintiff was sufficient to justify a finding that *at the time of the trial* an iron or steel tamper of the kind used by the plaintiff was not reasonably safe in that hazardous employment and that the explosion which caused the defendant's injury could

only have happened by the use of that dangerous instrument. That was the situation seven years after the accident.

V. The evidence sufficiently shows that only iron or steel tampers were used in the Bevier mines at the time of the plaintiff's injury except an occasional wooden tamper which the miners used. There is nothing to show that they used the wooden tampers at that time because the iron tampers were dangerous. They might have used them to save the expense of buying tampers. The plaintiff himself testified that at the time neither the foreman nor any representatives of the company told him how to use the tamper nor anything about it. He did not know the difference between an iron tamper and any other kind until after the explosion. He did not know that an iron tamper was dangerous. He had worked in a mine and had seen other men use iron tampers.

Sam Cook, the principal witness for the plaintiff, testified that he had worked for the Central Coal & Coke Company for sixteen years, that he worked in Mine 66, the one in which the plaintiff was injured, and that he was thirty-five or thirty-six years old. This question was asked him:

"Q. You had been working in that mine all that time and didn't realize that using a steel tamper—you didn't realize the danger of it in all those years you worked in the mine? A. I realize the danger now.

"Q. Oh, yes, now; but I say you never realized the danger while you worked there? A. No, sir."

He quit working in that mine in 1916, the year before the injury.

All the evidence in relation to the danger of using iron or steel tampers, of it producing a spark, and the like, was placed as of the time of the trial.

One W. F. Davis lived in Belleville, Illinois, and worked for the Central Coal & Coke Company. He had been an engineer. He was asked whether in his opinion an iron tamper was a proper tool to use in pushing back the powder. He answered, "No sir." An iron tamper would cause a spark in Missouri, California, or any other state, and that copper had the same qualities throughout the world. He was asked as an expert the hypothetical question, reciting the facts of the explosion in this case, whether in his judgment an explosion was caused by a spark in the use of the iron tamper, and he testified that in his opinion it was caused by a spark and by the use of the iron tamping bar. Thus he testified to two facts: that the explosion in this case was caused by the use of the steel tamper, and that at the time he testified it was an unsafe tool to use.

Other witnesses for the plaintiff gave similar testimony. Of course if an iron tamper was an unsafe tool to use at the time of the trial it was an equally unsafe tool at the time the plaintiff was hurt. But at the time he was hurt the only kind of a tamper which the company furnished and which was in general use, so far as the evidence shows, was the iron or steel tamper—the kind he used. There is no evidence that at that time any other or safer tamper had come into general use in Missouri or anywhere else, or that the danger of using a steel tamper was sufficiently known and realized to make necessary the use of other tampers. The plaintiff himself testified that since 1920 he learned that copper-tipped tampers were the proper ones to use.

The tamper was described by John Stolen, half-brother of plaintiff, who was working with him at the time, as having "a large head with a fish tail." From this we infer that there was a hammer-like head at the end of the tamper. A groove was in the side of this for the purpose of permitting the fuse to pass along so that by carefully inserting the cartridge and pushing it back and seeing that the fuse was in the groove the cartridge could be inserted without spilling the powder. This fact would also indicate the reasonable safety of the instrument used.

The defendant, under the authorities cited, was not under obligation to furnish the very best appliances. He discharged his duty when he furnished tools which were then in general use and were regarded as reasonably safe. Plaintiff's main witness testified that he did not know, notwithstanding all his experience, that an iron tamper was unsafe until after the injury to the plaintiff. No witness testified to any knowledge at the time of plaintiff's injury, or prior thereto, that a steel or iron tamper was dangerous.

It is quite probable from the evidence that the injury to plaintiff, apparently the first of its kind in a Missouri mine, and similar injuries after that, called attention to the danger of using iron tampers in mines where hard substances are likely to be struck by them. The evidence is entirely insufficient to charge the defendant with notice at the time the plaintiff was furnished an iron tamper, that it was a dangerous instrumentality.

Lehigh & Wilkes-Barre Coal Co. v. Sawickas, 247 Fed. 432, was an action for injuries caused to plaintiff by premature explosion, similar to the one under consideration here, while shoving the charge of powder into the hole with a steel tamping bar. The court held that the use of such tamping bar at that time, November, 1917, had not been shown to be dangerous; there was no proof that the master knew of the alleged danger in the tool, or that such danger was so notorious that knowledge must be imputed, and therefore he was under no duty to inform his employee of the danger. There was a

dissenting opinion in that case. The evidence in favor of the plaintiff there seems stronger than in this case.

In DeNardo v. Stephens-Jackson Co., 261 Pa. St. 230, a similar case, an iron tamping bar caused a premature explosion and the injury for which the plaintiff sued. The evidence tended to show that wooden rods were in general use for the purpose in other mines and were used because they were safer and would not strike fire. It also appeared that the drill hole was filled with loose powder, with no construction of a spark-proof, waterproof cartridge, as employed by the defendant in this case.

Here we have iron or steel tampers and only those in general use in a mine where the plaintiff was injured, or elsewhere in Missouri, so far as the evidence shows. There is no evidence whatever that any other kind of tampers were used anywhere at the time. Up to the time of the injury there was no evidence of an accident of like nature in the Bevier mines and no evidence that such injury had occurred anywhere in any mine known to the witness.

Section 7477, Revised Statutes 1919, forbade the use of loose powder for blasting or otherwise than by properly constructed cartridges. This to the legislative mind seemed a sufficient protection of the miner against a steel tamping bar. It was evidently thought to be sufficient by miners and operators up to the time of plaintiff's injury.

The plaintiff brought this suit seven years after his injury. If he had been of age the Statute of Limitations would have barred his action. It is reasonable to infer that at the time of his injury he was advised that the defendant owed him no duty to furnish a different kind of tamper. After he acquired experience in Illinois and elsewhere and learned that other and safer tampers were later used he saw fit to bring this suit. There is no evidence to show that the defendant at the time of the injury had any more knowledge of the danger of the use of a steel tamper or of the use elsewhere of any other kind of a tamper than the plaintiff and his main witness, Sam Cook, had.

So we are constrained to hold that the evidence fails to show that at the time the plaintiff was injured the defendant was under any duty to supply him with a tamper other than the one which was furnished him.

The judgment accordingly is affirmed. All concur, except *Blair,* *J.,* who dissents.